**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| KOJO AMISSAH, | : | | |
| | : | | |
| *Plaintiff*, | : | Civil Action No.: | 19-679 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 41, 46 |
| | : | | |
| GALLAUDET UNIVERSITY, | : | | |
| | : | | |
| *Defendant*. | : | | |

**MEMORANDUM OPINION**

**GRANTING DEFENDANT GALLAUDET UNIVERSITY'S MOTION FOR SUMMARY JUDGMENT;
GRANTING PLAINTIFF KOJO AMISSAH'S MOTION FOR LEAVE TO FILE SUR-REPLY**

**I. INTRODUCTION**

This case involves an employment discrimination action under the Americans with Disabilities Act ("ADA") brought by Plaintiff, Kojo Amissah, proceeding pro se against Defendant, Gallaudet University ("Gallaudet"). Dr. Amissah claims he was discriminated against in the process of hiring a Chief Diversity Officer ("CDO") when Gallaudet failed to select him for the position. This matter now comes before the Court on Gallaudet's Motion for Summary Judgment ("Def.'s Mot."), ECF No. 41, and Dr. Amissah's Motion for Leave to File a Sur-reply ("Pl.'s Sur-reply Mot."), ECF No. 46. For the reasons stated below, Gallaudet's motion for Summary Judgment is **GRANTED** and Dr. Amissah's Motion for Leave to File a Sur-reply is **GRANTED.**

## II. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A. Background[1]

Dr. Amissah is a deaf individual who is proficient in American Sign Language ("ASL") and was employed by Gallaudet at the time of the CDO vacancy announcement. Pl.'s Resp. to Interrogs. at 2–3, ECF No. 41-2; *see* Def.'s Mot. Ex. 2 at 5, ECF 41-3.[2] Gallaudet University is a federally chartered private university for the deaf and hard of hearing. *See* Def.'s Mot. Ex. 13 at 2–4, ECF No. 41-14. Dr. Ndura was the selected candidate for the CDO position in 2017. *See* Def.'s Mot. Ex. 5, Decl. Gaurav Mathur ¶¶ 18–20, ECF No. 41-6.

### B. CDO Position

In late 2016, Gallaudet created the position of CDO, established a search committee, and posted its announcement for the position. *See* Def.'s Mot. Ex. 3, Decl. Sharrell McCaskill ¶¶ 7–10, ECF No. 41-4. In 2017, Gallaudet revised the position, established a new search committee of Gallaudet employees and students—of which six out of ten members were deaf—and re-posted the position in February 2017. *Id.* at ¶¶ 14–17; *see* Def.'s Mot. Ex. 5 ¶¶ 5–6; Def.'s Mot. Ex. 6, Decl. Heather Harker ¶¶ 4–6, ECF No. 41-7; Def.'s Mot. Ex. 4, ECF No. 41-5. The vacancy announcement indicated that the "ideal candidate should possess an advanced degree (PhD preferred) with a minimum ten years of experience in a leadership role related to diversity, inclusion, education and workplace equity, multiculturalism, and community building." Def.'s Mot. Ex. 4 at 2.

---

[1] Unless otherwise noted, this section recounts only facts that the parties do not dispute or facts substantiated by the record.

[2] For ease of reference, when referring to filings, the Court cites the page numbers designated by ECF.

A slate of twelve candidates—including both deaf and hearing candidates, as well as Dr. Amissah—were selected for the search committee's review. *See* Def.'s Mot. Ex. 5 ¶¶ 10–12; *see generally* Def.'s Mot. Ex. 8, ECF No. 41-9. The search committee evaluated the candidates according to a screening rubric established by Gallaudet. *See* Def.'s Mot. Ex. 8; Def.'s Mot. Ex. 5 ¶ 10; *See* Def.'s Mot. Ex. 6 ¶ 10. The rubric consisted of the following seven categories: (1) Educational background; (2) Professional experience; (3) Building and implementing programs; (4) Working with diverse groups and Human Resources/EEO; (5) Management/supervisory experience; (6) Experience/ability to work in a team; and (7) Commitment to bilingualism, linguistic equity and cultural competence. *See* Def.'s Mot. Ex. 8 at 1–4. The search committee ranked each candidate from one to three in each category, with three being the highest and indicating that the candidate had the most relevant experience. *Id.*

For the "Education background" category, the higher scores were given to candidates who had advanced degrees—PhD and master's degrees—in "diversity, organizational development, education, human resources, social justice education or a related field." *Id.* at 11. For the "Professional experience" category, the highest score was given to candidates who had "a minimum ten years of experience in a high-level leadership role related to diversity, inclusion education and workplace equity, multiculturalism, and community building in a higher education and/or K-12 environment." *Id.* (emphasis omitted). For the "Building and implementing programs" category, the highest score was given to candidates who had "substantive evidence of creating and building programs to address equity, diversity and inclusion." *Id.*

Proficiency in ASL was not listed as a requirement in any of the categories in the screening rubric, nor in the vacancy announcement. *Id.* at 11–14; Def.'s Mot. Ex. 4. However, because it was Gallaudet's policy that all staff must become proficient in ASL over time, the

3

selected candidate was expected to take ASL training if they were not already ASL proficient. *See* Def.'s Mot. Ex. 9 at 3, ECF No. 41-10.  Furthermore, the candidates were expected to explain their preparedness for the role by demonstrating "how they will be effective in a bilingual community and the support they will require to be effective in this role . . . ."  Def.'s Mot. Ex. 4 at 2.  Notably, the screening rubric afforded extra weight to candidates that had "additional desirable skills than can be helpful to the program, such as . . . experiences in other languages."  *See* Def.'s Mot. Ex. 8 at 13.

     Once the search committee evaluated each candidate, the six candidates with the top six scores were selected for the first interview round.  *See* Def.'s Mot. at 6; Def.'s Mot. Ex. 5 ¶¶ 12–13; Def.'s Mot. Ex. 6 ¶¶ 12–13.  Dr. Amissah's score was not among the top six and he was not selected for the first interview round.  *See* Def.'s Mot. Ex. 5 ¶ 12; Def.'s Mot. Ex. 6 ¶ 12; Def.'s Mot. Ex. 8.  The three final candidates selected for the second interview round were Dr. Elaive Ndura (who is hearing), Donna Hay-Jones (who is hearing), and Charity Warigon (who is deaf). *See* Def.'s Mot. Ex. 5 ¶ 14; Def.'s Mot. Ex. 6 ¶ 14.  After the second round of interviews, the search committee recommended Dr. Ndura to Gallaudet President Roberta Cordano, who accepted the search committee's recommendation.  *See* Def.'s Mot. Ex. 5 ¶¶ 18–19; Def.'s Mot. Ex. 6 ¶¶ 18–19.  Dr. Ndura accepted the position and began serving as CDO on July 10, 2017. *See* Def.'s Mot. Ex. 5 ¶¶ 20–21.

### C.  Dr. Amissah's and Dr. Ndura's Comparative Qualifications

At the time Dr. Amissah applied for the CDO position, he had been employed as a career consultant at Gallaudet since 2003 and an adjunct professor at Gallaudet since 2012.  *See* Def.'s Mot. Ex. 2 at 5. Furthermore, from 2007–2010, he served as a Presidential Leadership Fellow for Gallaudet where he "envisioned, advised the President, researched, and collected data to

4

create and implement the [CDO] position." *Id.*; Pl.'s Resp. to Interrogs. at 2–3.  Additionally, he served in several professional leadership positions since 2005; first as a Coordinator for "Keeping the Promise" and including about four years as Chair for the Gallaudet University Staff Council.  *See* Def.'s Mot. Ex. 2 at 5–6; Pl.'s Mem. in Opp'n Def.'s Mot. ("Pl.'s Opp'n") Ex. 1, Decl. Anibelka Henriquez Squires ¶¶ 15, 27, ECF No. 43-1; Pl.'s Opp'n Ex. G at 48, ECF No. 43.  Furthermore, his educational background included: a (1) Doctor of Management ("D.M.") in Organizational Leadership and Management; (2) Certification in Human Resource Management; (3) Master of Science ("M.S.") in Service Quality Management; (4) Bachelor of Science ("B.S.") in Hotel and Resort Management; and (5) Associate of Applied Science ("A.A.S.") in Architectural Technology.  *See* Def.'s Mot. Ex. 2 at 5.  For each screening rubric category, Dr. Amissah received the following scores: (1) Education Background—2.6; (2) Professional experience—2.15; (3) Building and implementing programs—2.1; (4) Working with diverse groups and Human Resources/EEO—1.8; (5) Management/supervisory experience—1.888889; (6) Experience/ability to work in a team—1.8; and (7) Commitment to bilingualism, linguistic equity and cultural competence—2.15.  *See* Def.'s Mot. Ex. 8 at 1–4.

At the time Dr. Ndura applied for the CDO position, she had been employed as a Presidential Fellow for Diversity and Inclusion from 2015–16 and Professor at George Mason University ("GMU") since 2011.  *See* Def.'s Mot. Ex. 11 at 11, ECF No. 41-12.  Additionally, Dr. Ndura had served in several professional leadership positions since 1990 as an adjunct faculty of Bilingual/Multicultural Education at Northern Arizona University ("NAU") until her role as a Presidential fellow at GMU.  *Id.* at 1, 11–14, 21–22, 51–54.  Furthermore, her educational background included: a (1) Doctor of Education, Curriculum and Instruction, Bilingual/Multicultural Education; (2) Graduate Certificate, Conflict Resolution Advanced

5

Skills; (3) Master of Education, Teaching English for Specific Purposes; and (4) Bachelor of Humanities & Social Sciences, English Language and Literature. *Id.* at 15. For each screening rubric category, Dr. Ndura received the following scores: (1) Educational background—3; (2) Professional experience—2.7; (3) Building and implementing programs—2.8; (4) Working with diverse groups and Human Resources/EEO—2.6; (5) Management/supervisory experience—1.95; (6) Experience/ability to work in a team—2.7; and (7) Commitment to bilingualism, linguistic equity and cultural competence—2.7. *See* Def.'s Mot. Ex. 8.

### D.  Present Action

Dr. Amissah initiated this matter against his employer Gallaudet in D.C. Superior Court under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*; the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.*; and the Genetic Information Nondiscrimination Act ("GINA"), 42 U.S.C. § 2000ff *et seq.* Notice of Removal Ex. 1, Pet. for Review of Agency Dec. (Feb. 4, 2019), ECF No. 1-1. After removing to this Court, Gallaudet moved to dismiss Dr. Amissah's claims for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). *See* Def.'s Mot. Dismiss, ECF No. 5. In June 2019, the Court granted Gallaudet's Motion to Dismiss, dismissing Dr. Amissah's claims without prejudice. *Amissah v. Gallaudet Univ.*, No. 19-cv-679, 2019 WL 2550334, at *3 (D.D.C. June 20, 2019).

On July 26, 2019, the Court received Dr. Amissah's Amended Complaint, and consequently Gallaudet filed its Motion to Strike Dr. Amissah's Amended Complaint on August 13, 2019. *See* Pl.'s Am. Compl. at 1–2, ECF No. 11; *see* Def.'s Mot. to Strike, ECF No. 12. The Court granted in part and denied in part Gallaudet's Motion to Strike, striking all but one of Dr. Amissah's claims. *See* Order Granting in Part & Den. in Part Def.'s Mot. to Strike at 15, ECF

6

No. 15.  The Court ordered that Gallaudet need only respond to Dr. Amissah's claim under the ADA that he was discriminated against in the process of hiring a CDO in 2016.  *Id.*

On May 13, 2022, Gallaudet filed the present Motion for Summary Judgment on Dr. Amissah's ADA claim for non-selection, which the parties have fully briefed, and is now ripe for decision.  *See* Def.'s Mot.; Pl.'s Opp'n; Def.'s Reply to Pl.'s Opp'n ("Def.'s Reply"), ECF No. 44.  Finally, on June 29, 2022, Dr. Amissah filed a Motion for Leave to File a Sur-reply.  *See* Pl.'s Sur-reply Mot.; Pl.'s Sur-reply to Def.'s Reply ("Pl.'s Sur-reply"), ECF No. 45.

### III. LEGAL STANDARD

#### A. Summary Judgment

A court may grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A "material" fact is one capable of affecting the substantive outcome of the litigation.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is "genuine" if there is enough evidence for a reasonable jury to return a verdict for the non-movant.  *See Scott v. Harris*, 550 U.S. 372, 380 (2007).  The Court's inquiry is essentially "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson*, 477 U.S. at 251–52.

The principal purpose of summary judgment is to streamline litigation by disposing of factually unsupported claims or defenses and determining whether there is a genuine need for trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  The movant bears the initial burden of identifying portions of the record that demonstrate the absence of any genuine issue of material fact.  *See id.* at 323; Fed. R. Civ. P. 56(c)(1).  In response, the party opposing summary

7

judgment must point to specific facts in the record that reveal a genuine issue that is suitable for trial. *See* Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 324. In doing so, the nonmovant may not rely on "statements that are impermissible hearsay or that are not based on personal knowledge." *Shuler v. District of Columbia*, 744 F. Supp. 2d 320, 327 (D.D.C. 2010) (citation and quotations omitted).

In considering a motion for summary judgment, a court must "eschew making credibility determinations or weighing the evidence," *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007), and all underlying facts and inferences must be analyzed in the light most favorable to the nonmovant, *see Anderson*, 477 U.S. at 255. Nevertheless, conclusory assertions offered without any evidentiary support do not establish a genuine issue for trial. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999). Additionally, the Court need not assume the role of advocate for a pro se plaintiff. *Davis v. Kelly*, 160 F.3d 917, 922 (2d Cir. 1998) ("[A] court need not act as an advocate for pro se litigants . . . ."); *Sun v. D.C. Gov't*, 133 F. Supp. 3d 155, 168 n.6 (D.D.C. 2015) ("[I]t is not the Court's job to canvass the record for documents supporting a pro se party's position.").

## IV. ANALYSIS

### A. Dr. Amissah Was Not Significantly More Qualified than Dr. Ndura.

Gallaudet's proffered legitimate, non-discriminatory reason for selecting Dr. Ndura over Dr. Amissah was because Dr. Amissah "was not as qualified for the [CDO] position as [Dr. Ndura]." Def.'s Mot. at 15. Dr. Amissah argues that Gallaudet's proffered explanation is pretext because he was "significantly better" qualified than Dr. Ndura for the CDO position. *See* Pl.'s Sur-reply at 7. The Court disagrees.

Where the plaintiff cannot produce direct evidence of discrimination, ADA discrimination claims are analyzed using the familiar three-part burden shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *See Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1288 (D.C. Cir. 1998) (applying the *McDonnell–Douglas* framework to an ADA discrimination claim). First, the plaintiff must initially prove his prima facie case by a preponderance of the evidence. *McDonnell Douglas*, 411 U.S. at 802. Second, the burden of production shifts to the employer, who must articulate a legitimate, non-discriminatory reason for its action. *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 254 (1981). Third, the plaintiff must demonstrate that the employer's proffered explanation is a pretext masking prohibited discrimination. *Id.* at 256. Because Gallaudet has asserted a legitimate, non-discriminatory reason for Plaintiff's non-selection—Dr. Amissah was not as qualified for the position as Dr. Ndura—this Court will only assess whether Dr. Amissah's evidence can demonstrate that Gallaudet's proffered reason is pretext. *See Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008); Def.'s Mot. at 15.

Moreover, when an employer argues that its hiring decision was based on the candidates' relative qualifications, "a plaintiff can directly challenge that qualifications-based explanation only if the plaintiff was '*significantly better* qualified for the job' than those ultimately chosen." *Adeyemi v. District of Columbia*, 525 F.3d 1222, 1227 (D.C. Cir. 2008) (emphasis added) (quoting *Holcomb v. Powell*, 433 F.3d 889, 897 (D.C. Cir. 2006)). "[T]he qualifications gap must be great enough to be inherently indicative of discrimination." *Holcomb*, 433 F.3d at 897.

Furthermore, even "[i]n cases where the comparative qualifications are close, a reasonable jury would not usually find discrimination." *Adeyemi*, 525 F.3d at 1227. Instead, "the jury would 'assume that the employer is more capable of assessing the significance of small

9

differences in the qualifications of the candidates, or that the employer simply made a judgment call.'" *Id.* (quoting *Aka*, 156 F.3d at 1294). In these cases, courts "'defer to the employer's decision of what nondiscriminatory qualities it will seek' in filling a position . . . ." *Jackson v. Gonzales*, 496 F.3d 703, 708 (D.C. Cir. 2007) (alterations omitted) (quoting *Stewart v. Ashcroft*, 352 F.3d 422, 429 (D.C. Cir. 2003)). Because courts are not "a super-personnel department that reexamines an entity's business decisions," *id.* at 707 (internal quotation marks omitted) (quoting *Holcomb*, 433 F.3d at 897), it must not "second-guess an employer's personnel decision absent demonstrably discriminatory motive," *Fischbach v. D.C. Dep't of Corrs.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (internal quotation marks omitted) (quoting *Milton v. Weinberger*, 696 F.2d 94, 100 (D.C. Cir. 1982)).

Here, a comparison of Dr. Amissah's and Dr. Ndura's qualifications demonstrates that Dr. Amissah was not significantly more qualified for the CDO position than Dr. Ndura. First, the vacancy announcement for the CDO prioritized "a minimum ten years of experience in a leadership role related to diversity, inclusion, education and workplace equity, multiculturalism, and community building." *See* Def.'s Mot. Ex. 4 at 2. Dr. Ndura's application shows she had consistent professional experience in building and implementing diversity programs since 1990, as an adjunct faculty of Bilingual/Multicultural Education at NAU, until 2016 as a Presidential Fellow for Diversity and Inclusion at GMU. *See* Def.'s Mot. Ex. 11 at 1, 11–14, 21–22, 51–54. That adds up to a minimum of twenty-six years of relevant experience. While Dr. Amissah's experience was also notable, he can only show that his relevant professional experience began in 2003 as a career consultant for Gallaudet University, until 2016 as a chair for the Gallaudet Staff Council—adding up to 13 years of experience. *See* Pl.'s Opp'n Ex. G at 48; Def.'s Mot. Ex. 2 at 5, 9. Furthermore, Dr. Amissah received a lower screening rubric score than Dr. Ndura in the

"Building and implementing programs" and "Professional experience" categories.  Def.'s Mot. Ex. 8 at 2, 7.[2]

Moreover, Dr. Amissah does not argue that Gallaudet objectively misstated his relevant leadership qualifications.[3]  Rather, he argues that the screening rubric's inclusion of leadership experiences, other than "dean level," shows that Gallaudet "inflate[d]" Dr. Ndura's experience "because she is a hearing person."  *See* Pl.'s Opp'n at 16–18.  However, he points to no evidence in the vacancy announcement or screening rubric that shows "dean level" experience was a requisite in the screening rubric's "Professional experience" and "Building and implementing programs" categories.  *Id.*; *see also* Def.'s Mot. Ex. 4; Def.'s Mot. Ex. 8 at 1–2.  Without such evidence, Dr. Amissah's qualifications-based argument fails under the rulings of this Circuit which require "more than simply criticizing the employer's decisionmaking process" to show pretext.  *Hairston v. Vance-Cooks*, 773 F.3d 266, 272 (D.C. Cir. 2014); *see also Jackson*, 496 F.3d at 708–09 (same).

---

[2] Dr. Amissah does not assert that any members of the committee harbored discriminatory animus, and, in fact, a majority of the committee members were deaf.  *See* Def.'s Mot. Ex. 5, Decl. Gaurav Mathur ¶¶ 5–6.

[3] A plaintiff may also oppose a motion for summary judgment by demonstrating that "the employer's explanation misstates the candidates' qualifications."  *Aka*, 156 F.3d at 1295; *see also Holcomb*, 433 F.3d at 897.  For example, "if the employer says that it did not hire the plaintiff because he did not speak Portuguese, [and] the plaintiff can show that he *did* speak Portuguese, and that the employer knew it," that "may suffice to permit a jury to infer that the employer's explanation is incorrect or fabricated, and thus to infer discrimination."  *Aka*, 156 F.3d at 1295; *see also Simpson v. Leavitt*, 437 F. Supp. 2d 95, 103 (D.D.C. 2006) (interpreting *Aka* to suggest that "an employer's statement must be *objectively incorrect* in order to qualify as a 'misstatement'" (emphasis added)).  However, Dr. Amissah has not identified objective inaccuracies here; he merely disagrees with the search committee's assessment of his and Dr. Ndura's qualifications.  *See generally* Pl.'s Opp'n.  That is not enough to create a dispute of material fact.  *See Hairston*, 773 F.3d at 273; *Williams v. Shinseki*, 967 F. Supp. 2d 95, 105 (D.D.C. 2013); *Chudson v. Watt*, 125 F. Supp. 3d 255, 265 (D.D.C. 2015).

11

Second, Dr. Amissah argues that he should have an equal rating to Dr. Ndura in the "Educational background" category, and that his committee rating therefore shows bias against him. *See* Pl.'s Opp'n at 15–16.  However, both of Dr. Ndura's advanced degrees were in education—one of the preferred educational fields in the screening rubric—while Dr. Amissah's D.M. in Organizational Leadership was his only advanced degree in a preferred field—Organizational Development.  *See* Def.'s Mot. Ex. 11 at 15; Def.'s Mot. Ex. 2 at 5.  Thus, a reasonable jury could not infer that Dr. Amissah's lower rating is attributable to discrimination rather than the relevance of Dr. Ndura's degrees to the fields afforded more weight in the rubric. *See* Def.'s Mot. Ex. 4 at 2; Def.'s Mot. Ex. 8 at 11.  Indeed, particularly because Dr. Amissah's and Dr. Ndura's comparative educational qualifications are close, a reasonable jury could not infer discrimination because the jury would assume Gallaudet is "more capable of assessing the significance of small differences in the qualifications of the candidates." *Adeyemi*, 525 F.3d at 1227 (quoting *Aka*, 156 F.3d at 1294); *see also Jo v. District of Columbia*, 582 F. Supp. 2d 51, 62–63 (D.D.C. 2008) ("Although Plaintiff clearly values his own credentials and experiences, a plaintiff's subjective assessment of his own record is largely irrelevant.").

Third, Dr. Amissah argues he is significantly more qualified than Dr. Ndura because he "envisioned, advised the President, researched, and collected data to create and implement the [CDO] position," unlike Dr. Ndura.  Pl.'s Resp. to Interrogs. at 2–3; *see also* Pl.'s Opp'n at 24, 27–28.  However, Dr. Amissah offers no evidence, nor points to anywhere in the vacancy announcement and screening rubric, that preference would be given to candidates who helped draft the position.  *See generally* Pl.'s Opp'n; Pl.'s Sur-reply.  Once again, without such evidence, here, Dr. Amissah's qualifications-based argument fails because he is "second-guess[ing] [the] employer's initial choice of appropriate qualifications," which is insufficient to

12

establish pretext in this Circuit. *Jackson*, 496 F.3d at 708; *Hairston*, 773 F.3d at 272; *Fischbach*, 86 F.3d at 1183.

In sum, the evidence shows that Dr. Ndura had twenty-six years of relevant leadership experience, two advanced degrees in education, and higher scores in every category of the screening rubric. In comparison, Dr. Amissah had at most only thirteen years of relevant leadership experience and two advanced degrees, only one of which was preferred by the rubric. Thus, even viewing the evidence in the light most favorable to Dr. Amissah, and considering case law in this Circuit, no reasonable jury could conclude from this record that there was a qualifications gap in his favor great enough to "be inherently indicative of discrimination." *Holcomb*, 433 F.3d at 897; *cf. Aka*, 156 F.3d at 1286, 1295–96 (finding such inference where plaintiff held both a bachelor's and master's degree and had nineteen years of relevant industry experience, while the selected applicant had no college education and had little over a year of relevant experience); *Hamilton v. Geithner*, 666 F.3d 1344, 1353, 1357 (D.C. Cir. 2012) (finding evidence of "significant disparity" where plaintiff had nineteen years of relevant experience and a master's and bachelor's degree, while the selected candidate only had eight years of relevant experience and no college degree).

### B. The Lack of ASL Proficiency as a Requirement Does Not Raise an Inference of Discrimination.

To support his claim for discrimination, Dr. Amissah also relies on the fact that the vacancy announcement and the screening committee's rubric did not require candidates to be fluent in ASL. He argues that Gallaudet did not require ASL fluency for the CDO position "because it prefers hearing people who cannot use ASL," and in doing so "discriminated against all deaf candidates." Pl.'s Opp'n at 33, 31. Gallaudet argues that the selection process itself

"belies any evidence of discrimination." *See* Def.'s Reply at 6.  The Court agrees with Gallaudet.

As part of Gallaudet's staff policy, "all employees are expected to be able to communicate in sign language," and if they did not have sign language skills at the time of hire, they would be expected to participate in training "to be able to communicate in sign language effectively."  Def.'s Mot. Ex. 9 at 3.  Thus, contrary to Dr. Amissah's assertion, Gallaudet may have preferred candidates fluent in ASL because it would not have to allocate resources to provide a translator while the selected candidate participated in training.  Furthermore, the screening rubric afforded extra weight to candidates that had "additional desirable skills than can be helpful to the program such as . . . experiences in other languages."  *See* Def.'s Mot. Ex. 8 at 13.  Therefore, the screening rubric would have given preference to candidates with "desirable skills" such as experience in ASL.  Furthermore, any inference of discrimination is undercut by the fact that President Cordano—the final decision-maker—and most of the selection committee were deaf.  *See* Def.'s Mot. Ex. 5 ¶¶ 5–6, 18–19; Def.'s Mot. Ex. 6 ¶¶ 5–6, 18–19; *Ranowsky v. Nat'l. R.R. Passenger Corp.*, 244 F. Supp. 3d 138, 144 (D.D.C. 2017) ("Courts in our District have repeatedly held that a decision-maker's inclusion in the same protected class as the terminated plaintiff cuts against any inference of discrimination."), *aff'd*, 746 F. App'x. 23 (D.C. Cir. 2018); *Perry v. Shinseki*, 783 F. Supp. 2d 125, 138 (D.D.C. 2011) (same).  Accordingly, Gallaudet's lack of ASL as a requirement for the CDO position, by itself, does not support an inference of discrimination.[4]

---

[4] Furthermore, Dr. Amissah has not produced statistical evidence from which a reasonable jury can infer that the lack of an ASL proficiency requirement in Gallaudet's hiring procedures had a disparate impact on deaf applicants.  *See generally* Pl.'s Opp'n; Pl.'s Sur-reply.  Accordingly, there is no genuine dispute of material fact.  *See Anderson v. Duncan*, 20 F. Supp. 3d 42, 54 (D.D.C. 2013), *amended by* 06-cv-1565, 2013 WL 12328768 (D.D.C. Nov. 15, 2013)

14

## C. The Court Grants Dr. Amissah's Motion for Leave to File Sur-Reply but Denies His Request to Appoint Counsel.

Dr. Amissah moves for leave to file a sur-reply to Gallaudet's reply. Pl.'s Sur-reply Mot. In his motion for leave to file, Dr. Amissah also mentions that he "requested a Court-appointed Counsel because [he] doesn't have . . . resources . . . ." *Id.* at 1. For the reasons stated below, the Court grants Dr. Amissah's motion for leave to file a sur-reply, but to the extent Dr. Amissah moves to appoint counsel, the Court denies that request.

This Court has discretion to grant leave to file a sur-reply. *See Akers v. Beal Bank*, 760 F. Supp. 2d 1, 2 (D.D.C. 2011). A sur-reply may be appropriate when the "proposed surreply would be helpful to the resolution of the pending motion" and the other party would not be "unduly prejudiced." *Glass v. Lahood*, 786 F. Supp. 2d 189, 231 (D.D.C. 2011), *aff'd*, No. 11-5144, 2011 WL 6759550 (D.C. Cir. Dec. 8, 2011); *Khine v. U.S. Dep't of Homeland Sec.*, 334 F. Supp. 3d 324, 331 (D.D.C. 2018), *aff'd*, 943 F.3d 959 (D.C. Cir. 2019). While Dr. Amissah's sur-reply rehashes the arguments raised in his opposition, the sur-reply is helpful for the Court to understand certain parts of his arguments in greater detail. Furthermore, the sur-reply would not prejudice Gallaudet because the sur-reply does not introduce any new facts that would change the outcome of summary judgment in Gallaudet's favor. *See* Pl.'s Sur-reply Mot. at 1; Pl.'s Opp'n at 7, 30 n.11. Accordingly, the Court grants Dr. Amissah's motion for leave to file a sur-reply to Gallaudet's reply.

---

(finding that a prima facie case of disparate impact under the ADA requires "a demonstration of causation through 'statistical evidence of a kind and degree sufficient to show that the practice in question . . . caused' individuals to suffer the offending adverse impact 'because of their membership in a protected group'") (quoting *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 994 (1988)); *Seth v. District of Columbia*, 18-cv-1034, 2019 WL 2058670, at *8 (D.D.C. May 8, 2019), *aff'd*, 813 F. App'x. 611 (D.C. Cir. 2020) (same).

Courts deciding whether to appoint counsel in employment discrimination cases consider: "(1) the ability of the plaintiff to afford an attorney; (2) the merits of the plaintiff's case; (3) the efforts of the plaintiff to secure counsel; and (4) the capacity of the plaintiff to present the case adequately without aid of counsel." *Poindexter v. FBI*, 737 F.2d 1173, 1185 (D.C. Cir. 1984); *see also* Local Civ. R. 83.11(3) (setting out the following factors for the appointment of counsel: "(i) Nature and complexity of the action; (ii) Potential merit of the pro se party's claims; (iii) Demonstrated inability of the pro se party to retain counsel by other means; and (iv) Degree to which the interests of justice will be served by appointment of counsel, including the benefit the Court may derive from the assistance of the appointed counsel"). In support of his request to appoint counsel, Dr. Amissah merely states that he does not have the knowledge, nor the resources after he was laid off by Gallaudet, to successfully litigate this case. *See* Pl.'s Sur-reply Mot. at 1.

Dr. Amissah's two-page motion gives the Court insufficient information from which to evaluate his financial need and efforts to obtain counsel. *See generally id.*; *see also Greggs v. Autism Speaks*, 987 F. Supp. 2d 48, 49–51 (D.D.C. 2013) (denying request where plaintiff presented no evidence—other than lack of a permanent job—of financial need and failed to describe his effort to secure counsel, and the case was a straightforward employment discrimination claim without unsettled law). Dr. Amissah is also highly educated and capable of representing himself. Finally, this is a fairly straightforward employment discrimination case with a single count, which the Court has determined is not meritorious. Accordingly, the interests of justice would not be served by appointment of counsel, and the Court denies the request.

\*   \*   \*

In conclusion, even drawing all justifiable inferences in his favor, Dr. Amissah has not presented evidence from which a reasonable jury could conclude there was a qualifications gap in his favor great enough to be inherently indicative of discrimination. Furthermore, Dr. Amissah has failed to present sufficient evidence that would permit a reasonable jury to conclude that the lack of the ASL requirement was motivated by discrimination against deaf applicants or gave a disadvantage to deaf applicants. Accordingly, there is no genuine dispute of material fact and Gallaudet is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Finally, the Court grants Dr. Amissah's motion for leave to file a sur-reply because it does not prejudice Gallaudet and denies his motion to appoint counsel.

## V. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment (ECF No. 41) is **GRANTED** and Plaintiff's Motion for Leave to File Sur-reply (ECF No. 46) is **GRANTED.** An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated: September 2, 2022                                                            RUDOLPH CONTRERAS
                                                                                                          United States District Judge